**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0789n.06

**No. 12-3951**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Aug 27, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BRUCE E. RICKER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| ZOO ENTERTAINMENT, INC.; | ) | STATES DISTRICT COURT FOR THE |
| MARK SEREMET; DAVID FREMED, | ) | SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Defendants-Appellees. | ) | |

Before: NORRIS, COOK, and McKEAGUE; Circuit Judges.

COOK, Circuit Judge. Plaintiff-appellant Bruce Ricker appeals the dismissal of a class-action securities complaint alleging that defendants-appellees Zoo Entertainment, Inc., Mark Seremet, and David Fremed (collectively, "Zoo") published material financial statements with reckless disregard of their falsity in violation of § 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j (the "Act"), Rule 10b 5 promulgated thereunder, 17 C.F.R. § 240.10b 5, and § 20(a) of the Act, 15 U.S.C. § 78t(a). Because Ricker's pleadings fail to support a "strong" inference that Zoo acted with scienter, we affirm.

No. 12-3951
*Ricker v. Zoo Entm't Inc.*

I.

A. Factual Background

Zoo develops, publishes, and distributes video game software. Throughout the proposed class period, Seremet and Fremed served as Zoo's Chief Executive Officer and Chief Financial Officer, respectively. David Rosenbaum served as President of Zoo Publishing, a separate company controlled by Zoo. On July 7, 2010, the first day of the proposed class period, Zoo priced 1.6 million shares of common stock for public offering and filed its final securities registration form with the SEC. With its registration, Zoo provided its first-quarter 2010 10-Q, which included the company's unaudited financial statements for that quarter.[1] Zoo filed its 10-Qs for the second and third quarters of 2010 that August and November, respectively.

On April 15, 2011, the class period's closing date, Zoo made three disclosures in a press release. First, despite record revenue in fiscal year 2010, Zoo's year-end audit revealed earlier "errors in recording certain transactions in the company's unaudited consolidated financial statements," that led Zoo to "restate its unaudited consolidated financial statements for these periods." In the accompanying Form 8-K ("the restatement"), Zoo concluded that its 10-Qs for the first, second, and third quarters of 2010 "should no longer be relied upon." Zoo attributed these

---

[1]As a publicly traded company, Zoo filed a 10-Q after each of its fiscal year's first three quarters. The 10-Q includes unaudited financial statements and public updates on Zoo's financial position. *See* Form 10-Q, *available at* http://www.sec.gov/answers/form10q.htm.

errors, in part, to "errors in recording certain transactions."  Restating revenue for those quarters, the company decreased 2010 first-quarter revenue by 3% ($17.132 million to $16.662 million), second-quarter revenue by 6% ($10.47 million to $9.776 million), and third quarter revenue by 2% ($17.581 million to $17.253 million).

The press release also disclosed that Zoo's independent accountants issued an opinion raising "substantial doubt about [Zoo's] ability to continue as a going concern."  The third and final announcement explained that weakness in the video game market led to lower-than-expected fourth quarter 2010 revenues  typically Zoo's highest revenue period.

The next trading day, Monday, April 18, 2011, Zoo's common stock price dropped 34.3%. Thereafter, Ricker sued, alleging that Zoo violated securities laws by filing 10-Qs "with . . . reckless disregard of their falsity at the time of such publication."

B.  Allegations Supporting Scienter

   1.  Cokem & Witness 3

Ricker's complaint primarily relies on information provided by Witness 3, a confidential witness and former employee in Zoo's accounting department.[2]  Witness 3 alleged that problems

---

[2]"While . . . anonymous sources are not altogether irrelevant to the scienter analysis," conclusory or vague allegations do not deserve much weight.  *Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008) (citation omitted), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323  25 (2011), *as recognized in Frank v. Dana Corp.*, 646 F.3d 954,

with one of Zoo's largest customers, Cokem, led Zoo to improperly recognize revenue. Witness 3 maintained that payments received from Cokem were always past due, and that she emailed Fremed and Rosenbaum, relaying that Cokem's owner was "very difficult to deal with[,] . . . never paid on time and demanded rebates and discounts well beyond" those afforded to other companies. (R. 14, Am. Compl. ¶ 32.) Despite Witness 3's attempts to prompt Cokem to pay its bills, she alleges that Rosenbaum cut deals with Cokem that forced Zoo to collect far less than Cokem owed. This prevented her from accurately projecting cashflow and hindered her ability to evaluate important billing and collection matters. Witness 3 further claims to have alerted Fremed and Seremet to the collection problems, emailing them daily "Year to Date Sales" reports that monitored what Zoo billed, the cash it received, and outstanding accounts receivable. Witness 3 stated that she told Fremed and Seremet about the inaccuracies in her cashflow projections, warning Seremet to "look closely at Rosenbaum and Cokem." Also, "[d]uring the Class Period, Witness 3 remembers hearing discussions of Company employees, questioning whether sales to Cokem were final" and stretching to "mak[e] the numbers . . . [by] push[ing] product with unusual sales enhancements."

Even as Cokem's share of Zoo's net revenue grew from 14% in 2008 to 40% in 2010, Ricker alleges that Seremet and Fremed allowed Rosenbaum, the Cokem account's primary contact and

960 62 (6th Cir. 2011). Here, Witness 3's employment in Zoo's accounting department positioned her to learn of the facts now alleged. The district court therefore credited Witness 3's perceptions more than the anonymous source in *Ley*. *See also Halford v. AtriCure, Inc.*, 2010 WL 8973625, at *3, *9 12 (S.D. Ohio Mar. 29, 2010) (crediting six confidential witnesses' allegations after examining their job descriptions to ascertain whether any could have gained first-hand knowledge of the facts attributed to him or her).

salesperson, to "maintain strict control over the relationship and contact with Cokem." This delegation of control, Ricker reasons, coupled with Seremet and Fremed's purported knowledge of problems with the Cokem account, demonstrates that Zoo "should have known that revenue numbers for Cokem were highly suspect." When the time came to restate revenue, however, Witness 3 played no role; Zoo "excluded" her from its restatement process.

### 2. Atari Litigation

Ricker next alleges that an Atari lawsuit filed against (and settled by) Zoo during the class period corroborates Zoo's alleged revenue-recognition problems with Cokem and further supports scienter. Incorporating allegations from Atari's complaint, Ricker explains that Zoo contracted with Atari to advance funds enabling Zoo to fulfill existing video-game purchase orders. In exchange, Zoo would remit payment for those purchase orders to Atari, including $1.6 million Cokem owed. Atari went unpaid and sued, claiming one of two things had occurred. Either Zoo received money for the purchase orders and kept it, or one or more of Zoo's customers cancelled purchase orders covered by the Atari agreement and Zoo retained Atari's advance.

### 3. Weak Internal Accounting Controls

Ricker alleges that Zoo's awareness of its weak internal controls particularly the lack of adequate finance staff supports a strong inference that it recklessly issued the 10-Qs. Zoo disclosed the following in its challenged 10-Qs:

> Our management has determined that we have a material weakness in our internal control over financial reporting related to not having a sufficient number of personnel with the appropriate level of experience and technical expertise to appropriately resolve non-routine and complex accounting matters or to evaluate the impact of new and existing accounting pronouncements on our consolidated financial statements while completing the financial statements close process. We are committed to addressing this in 2010 and we will reassess our accounting and finance staffing levels to determine and seek the appropriate accounting resources to be added to our staff to handle the existing workload.

(*E.g.*, R. 17-7, Zoo 2010 Q1 10-Q at 7.) Ricker alleges that because revenue recognition is "routine and non-complex," this disclosure should not shield Zoo's revenue-recognition error; Zoo acted with scienter by failing to also "alert investors that the most basic accounting matters were, themselves, suspect."

4. Magnitude of the Restatement

Zoo restated 3% of revenue for the first quarter of 2010, 6% for the second quarter of 2010, and 2% for the third quarter. The reduced revenues negatively affected diluted-net-income per share and diluted-net-loss per share. The restatement caused Zoo's diluted-net-income per share to fall from $0.10 to $0.01 for the first quarter of 2010; diluted-net-loss per share to rise from $0.11 to $0.22 during the second quarter of 2010; and diluted-net-income per share to fall from $0.04 to $0.01 during the third quarter of 2010. Ricker acknowledges the modest level of these revenue restatements, but posits that the "relatively small overstatement of revenue" caused "a massive overstatement of net income and . . . [earnings per share]," allowing Zoo the "ability to manipulate

revenue numbers . . . and report positive earnings." This overstatement of income and earnings per share, Ricker argues, supports a strong inference of scienter.

### 5. Reporting of False Financial Statements

Ricker alleges that because Zoo's revenue-recognition policy tracked generally accepted accounting principles ("GAAP"), Zoo's management knew how to properly recognize revenue, and their failure to do so here supports finding scienter.

### 6. Departure of Zoo Executives

To further support a strong inference of scienter, Ricker highlights the departures of three high-ranking Zoo officials after the restatement. First, Witness 3 alleged that Rosenbaum "left because he knew the Company was about to ask him to leave." Second, director John Bendheim, a former member of Zoo's Audit Committee, resigned. And third, within three months of the restatement, Chief Operating Officer Steve Buchanan left Zoo Publishing.

### 7. Motive to Raise Capital

Ricker's complaint also includes financial information that, he argues, demonstrates that Zoo's "capital raise just happened to coincide with the near exhaustion of Zoo's cash on-hand." Without that capital, Zoo could not have funded the projects it outlined in the offering's prospectus: $2 million to develop digital initiatives, $1.1 million to repay an advance, and $4.8 million in

working capital.  Though not expressly alleged in his complaint, Ricker concludes that, considering this information, Zoo was "motivated to commit fraud."  (Appellant Br. at 40  41.)

C.  District Court Proceedings

After evaluating Zoo's complaint "holistically," the court concluded that Ricker failed "to set forth a single allegation, let alone allegations leading to a strong inference of fraud, that the problems with the Cokem account had anything at all to do with the restatement."  Without information tying Witness 3's allegations about Cokem to the need to restate revenue, Ricker's complaint showed "at most[] that Zoo was financially mismanaged, not that Defendants fraudulently misled the public."  Ricker timely appeals the district court's adverse scienter determination.

II.

We review the district court's dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) de novo, "'constru[ing] the complaint in the light most favorable to the plaintiff' and 'accept[ing] all well-pleaded factual allegations as true.'" *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 467 (6th Cir. 2011) (quoting *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP* (*LSERS*), 622 F.3d 471, 477  78 (6th Cir. 2010)).  To prevail on his § 10(b) and Rule 10b  5 claim, Ricker's allegations must show "(1) a material misrepresentation or omission . . . ; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*

*Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011). Recklessness satisfies § 10(b)'s scienter element if plaintiffs demonstrate that defendants engaged in "highly unreasonable conduct which is an *extreme* departure from the standards of ordinary care." *LSERS*, 622 F.3d at 478 (quotation omitted, emphasis added).

The Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u 4(b), imposes more exacting pleading requirements than Federal Rules of Civil Procedure 8(a) and 9(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008). Plaintiffs "shall, with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u 4(b)(2). A "strong" inference of scienter "must be more than merely plausible or reasonable it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314. Before finding that a defendant acted recklessly, we "typically look for multiple, obvious red flags." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 686 87 (6th Cir. 2004), *abrogated on other grounds by Matrixx Initiatives, Inc.*, 131 S. Ct. at 1309. That is, "warning signs that would have revealed the accounting errors *prior* to their inclusion in public statements." *Id.* at 686 (emphasis added). Applied here, we review Ricker's pleadings to determine if he alleges facts supporting a strong inference that Zoo recklessly issued the challenged 10-Qs. We must decide whether Zoo's decision to publish the 10-Qs constituted highly unreasonable conduct that was an extreme departure from the standards of ordinary care.

Pleadings falling short of the PSLRA's heightened standard "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3). In light of our duty to consider "plausible opposing inferences" and review the complaint's allegations "holistically," *Tellabs, Inc.*, 551 U.S. at 322 26; *accord Matrixx Initiatives, Inc.*, 131 S. Ct. at 1324 25, we "forgo [an] itemized claim analysis," *Ashland, Inc.*, 648 F.3d at 469; *accord Frank*, 646 F.3d at 961. Upon fresh review, we conclude that Ricker's allegations, considered together, do not give rise to a strong inference that Zoo acted with scienter.

The inference that Zoo recklessly disregarded internal revenue-recognition problems to issue nine months' worth of financial statements is not as strong as at least one opposing inference: Zoo, a small company with acknowledged deficiencies in its accounting department, miscalculated revenue from Rosenbaum's account, precipitating the Atari litigation, this lawsuit, the restatement, and Rosenbaum's departure from Zoo. And factoring in the auditors' "going concern" opinion, the other two executives' departures make more sense than Ricker's securities-fraud alternative. Additionally, Ricker's pleadings, which focused on problems surrounding one account, failed to allege the "multiple, obvious red flags" that we typically require before inferring recklessness. *PR Diamonds*, 364 F.3d at 686.

Ricker's amended complaint thus falls short of the PSLRA's heightened pleading requirements. Although Ricker cobbles together a long list of alleged errors from Cokem, to the Atari litigation, to the departures of executives viewed "holistically," they stop short of raising an inference at least as compelling as a nonfraudulent inference. *LSERS*, 622 F.3d at 478. We agree

with the district court. Ricker's complaint showed "at most, that Zoo was financially mismanaged, not that Defendants fraudulently misled the public." (R. 31, Op. & Order at 11.)

Ricker presents an independent argument for reversal, arguing that because Zoo knew of alleged revenue-recognition problems "similar in nature and temporally proximate to the reasons for the restatement," that alone raises "a strong inference that Defendants acted recklessly." Ricker cites *In re Goodyear Tire & Rubber Co. Securities Litigation*, 436 F. Supp. 2d 873 (N.D. Ohio 2006), for the proposition that a plaintiff's complaint should survive a motion to dismiss if it pleads "similarity and temporal proximity" between an earlier-known accounting irregularity and the accounting irregularity disclosed in the restatement. Elaborating at oral argument, Ricker's counsel explained that, in his view, "the 40% of Cokem revenue need not have anything to do with what ultimately was restated for the defendants to have been aware of and willfully disregarded red flags." (Oral Arg. at 29:59  30:10.) Because Witness 3 informed Zoo of revenue-recognition concerns, and the restatement owed in part to "errors in recording certain transactions," Ricker's complaint should survive Zoo's motion-to-dismiss stage, so his argument goes.

*Goodyear*, a district court opinion, never offered such a rule. The *Goodyear* court rejected the plaintiffs' allegation that the company's prior knowledge of an accounting irregularity supported scienter, because the earlier irregularity suffered a "total lack of similarity and temporal proximity" to the accounting irregularity later disclosed in Goodyear's restatement. *Id.* at 894. But the *Goodyear* court did not stop there; it then considered the plaintiffs' scienter allegations in their

entirety. *See Goodyear*, 463 F. Supp. 2d at 893  903 (evaluating, among other factors, admissions of accounting irregularities, deliberate acts of fraud, manipulation of internal systems and pension discount rates, motive and opportunity).  Ultimately, the court concluded that plaintiffs failed to plead "specific facts, which, when viewed cumulatively, persuade the Court" that defendants "should have known about Goodyear's problems." *Id.* at 893.[3]  The timing and relatedness of the alleged accounting errors formed only one part of the court's scienter analysis.

This makes sense.  The PSLRA will not automatically allow a claim alleging, for example, irrelevant yet temporally and substantively similar conduct to proceed beyond the pleading stage. We must assess the entire complaint to determine whether its allegations give "rise to a strong inference" of scienter.  15 U.S.C. § 78u  4(b)(2)(A).  The district court's opinion did precisely this, holding that, "even if [Zoo] knew or should have known that the Cokem account was potentially problematic, . . . this simply does not reasonably lead    and certainly does not strongly lead    to the inference that [Zoo] knew or should have known that the original financial statements were false." (R. 31, Op. & Order at 11.)  We agree.

---

[3]When *Goodyear* was decided, a plaintiff needed to show the inference of scienter was the "most plausible" inference. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001)*.* But *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* overruled *Helwig* on this point, and now an inference of scienter must be "cogent and *at least as* compelling as any opposing inference of nonfraudulent intent."  551 U.S. 308, 314 (2007) (emphasis added).

III.

Alternatively, Ricker argues that the district court abused its discretion by granting Zoo's

motion to dismiss and closing the case without addressing Ricker's "request to amend the Complaint

to attempt to cure whatever defect the district court perceived in the Complaint."

Although Zoo's motion to dismiss put Ricker on notice of the alleged scienter deficiencies

in his amended complaint, he never moved for a second leave to amend. Yet he now invokes Rule

15(a)'s liberality to argue that he should have another chance. "[T]he PSLRA restricts the scope of

Rule 15(a) in the context of securities litigation such that plaintiffs have more limited ability to

amend their complaints." *LSERS*, 622 F.3d at 486. "[I]n the post-judgment context, we must be

particularly mindful of not only potential prejudice to the non-movant, but also the movant's

explanation for failing to seek leave to amend prior to entry of judgment." *Id.* (quotation omitted).

Ricker explains that he failed to file a pre-dismissal motion to amend because he "was

unaware of what defects, if any, the Court would perceive in the Complaint," and first deserved "the

opportunity to analyze the supposed deficiencies in the Complaint to determine whether he [could]

cure them." Plaintiffs, however, "'[are] not entitled to an advisory opinion from the Court informing

them of the deficiencies of the complaint and then an opportunity to cure those deficiencies.'"

*Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 573 (6th Cir. 2008) (quoting *PR Diamonds,*

364 F.3d at 699). The court acted within its discretion in denying leave to amend.

No. 12-3951
*Ricker v. Zoo Entm't Inc.*

This conclusion maintains even if we take judicial notice of Zoo's 2011 Form 10-K (which, we note, Ricker failed to bring to the district court's attention despite ample time to do so). That report discloses that Cokem accounted for less than 11% of Zoo's gross revenue in 2011 — down from 40% in 2010. This decline, Ricker argues, supports an inference that Zoo acted recklessly by issuing the 2010 10-Qs despite Witness 3's revenue-recognition warnings. Although it could have been that Rosenbaum's control over Cokem caused Zoo to improperly recognize 2011 revenue, it could as likely have been that the ending of Rosenbaum's relationship with Cokem or the general decline of the economy caused a 2011 sales drop. Nevertheless, the 2011 10-K fails to bolster Ricker's claim. Ricker has simply failed to state facts giving rise to a strong inference of recklessness.

IV.

We AFFIRM.