THACKER, Circuit Judge,
dissenting:
Since the enactment of the PSLRA, we have published eight decisions reviewing the dismissal of a securities fraud suit for failure to plead facts supporting a strong inference of scienter; in all of them, we concluded that the inference was lacking. See Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874, 894 (4th Cir.2014); Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 176 (4th Cir.2009); Pub. Emps.’ Ret. Ass’n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 306 (4th Cir.2009); Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 628 (4th Cir.2008); Teachers’ Ret. Sys. of La. v. Hunter, 477 F.3d 162, 184 (4th Cir.2007); In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 388-90 (4th Cir.2005); Ottmann v. Hanger Orthopedic Grp., Inc., 353 F.3d 338, 352-53 (4th Cir.2003); Phillips v. LCI Int’l, Inc., 190 F.3d 609, 620 (4th Cir.1999). In my view, the inference is lacking in this case, too.
The PSLRA requires a plaintiff in a securities fraud suit to “state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.” 15 U.S.C. § 78u-4(b)(2)(A). To establish this strong infer *612 ence, a plaintiff must persuade the court that it is as likely as not that the defendant acted with fraudulent intent or, at the very least, with “such severe recklessness that the danger of misleading investors was either known to the defendant or so obvious that the defendant must have been aware of it.” Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 623 (4th Cir.2008) (internal quotation marks omitted). Here, the allegations do not strongly imply either fraudulent intent or severe recklessness. Instead, the allegations suggest that Chelsea — while acknowledging the various challenges and setbacks encumbering its bid for FDA approval — submitted the Northera application with justifiable confidence in its chances for success. I therefore respectfully dissent.[1]
I.
A.
Scienter, as defined by the Supreme Court, is “a mental state embracing intent to deceive, manipulate, or defraud.” Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The federal circuit courts agree that reckless behavior may be enough to satisfy the scienter requirement in a securities fraud suit,[2] but they “differ on the degree of recklessness required.” Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 n. 3, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). The distinctions among the circuits include variations in terminology, with courts “referring to the recklessness standard variously as ‘deliberate’ or ‘eonscious recklessness,’ ‘severe recklessness,’ and ‘a high degree of recklessness.’ ” Ann Morales Olazábal, Defining Recklessness: A Doctrinal Approach to Deterrence of Secondary Market Securities Fraud, 2010 Wis. L.Rev. 1415, 1424 (footnotes omitted) (collecting cases).
In this circuit, we recognize that allegations of recklessness can satisfy the scienter requirement, see Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir.2009); see also Ottmann v. Hanger Orthopedic Grp., Inc., 353 F.3d 338, 344 (4th Cir.2003) (recognizing for the first time in this circuit that “a securities fraud plaintiff may allege scienter by pleading not only intentional misconduct, but also recklessness”), but we insist that the recklessness must be “severe” — that is, “a slightly lesser species of intentional misconduct.”, Ottmann, 353 F.3d at 344 (internal quotation marks omitted); see also Cozzarelli, 549 F.3d at 623; Teachers’ Ret. Sys. of La. v. Hunter, 477 F.3d 162, 184 (4th Cir.2007). This definition of recklessness, we have stated, “comports with the observation of the Supreme Court that ‘[t]he words “manipulative or deceptive” used in conjunction with “device or contrivance” strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct.’ ” Ottmann, 353 F.3d at 344 (alteration in original) (quoting Ernst & Ernst, 425 U.S. at 197, 96 S.Ct. 1375).
Our decision in Cozzarelli v. Inspire Pharmaceuticals, Inc. makes clear that *613 pleading scienter — whether in the form of fraudulent intent or severe recklessness— requires a showing of “wrongful intent.” 549 F.3d at 621. There, a group of shareholders alleged that a drugmaker seeking FDA approval of an experimental eye-disease treatment misled investors into believing that an important clinical trial was likely to succeed. See id. at 624-25. The drugmaker allegedly nurtured this false impression by withholding details about the trial’s endpoint while simultaneously representing that the trial was “very similar” to a previous successful trial. Id. at 625 (internal quotation marks omitted). We concluded that the allegations supported an inference that the drugmaker sought only to protect its competitive advantage in the marketplace; this inference, we stated, “is more powerful and compelling than the inference that [the drugmaker] acted with an intent to deceive.” Id. at 626 (emphasis supplied).
In the years since Cozzarelli our court has occasionally neglected to note that the recklessness necessary to support a finding of scienter must be “severe.” Compare Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874, 884 (4th Cir.2014) (“At the pleading stage, alleging either intentional or severely reckless conduct is sufficient.” (emphasis supplied)), with Matrix Capital, 576 F.3d at 181 (“Pleading recklessness is sufficient to satisfy the scienter requirement.”). The standard, though, remains unchanged. We have consistently stated that an allegedly reckless act must be “so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.” Matrix Capital, 576 F.3d at 181 (internal quotation marks omitted); see also Pub. Emps. ’ Ret. Ass’n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 314 (4th Cir.2009) (“In order to establish a strong inference of scienter, plaintiffs must do more than merely demonstrate that defendants should or could have done more. They must demonstrate that [defendants] were either knowingly complicit in the fraud, or so reckless in their duties as to be oblivious to malfeasance that was readily apparent.”). This understanding of scienter — that it necessarily entails a “culpable state of mind,” Ottmann, 353 F.3d at 348 — preserves section 10(b) as a prohibition on securities fraud. It ensures that corporations and their officers cannot escape liability through willful blindness— that is, purposeful ignorance of the truth of their own representations — while, at the same time, it prevents section 10(b) from devolving into a penalty for business decisions that, in hindsight, appear questionable.
B.
Here, under the PSLRA’s heightened pleading standard, the plaintiffs were required to allege facts giving rise to a strong inference of fraudulent intent or severe recklessness. See 15 U.S.C. § 78u-4(b)(2)(A); Cozzarelli 549 F.3d at 623. This is “no small burden.” Cozzarelli 549 F.3d at 624. Though the inference of scienter “need not be irrefutable,” it “must be more than merely ‘reasonable’ or ‘permissible.’ ” Tellabs, 551 U.S. at 324, 127 S.Ct. 2499. Unless a “reasonable person would deem the inference of scienter ... at least as compelling as any opposing inference” of nonfraudulent intent, the pleading fails. Id. The plaintiffs’ complaint here does not satisfy this standard.
1.
Reviewing the complaint in its entirety, it is clear that Chelsea had plenty of reason to believe the FDA would be receptive *614 to its application. More importantly, the facts strongly suggest that Chelsea acted on just such a belief.
To merit FDA approval, an application must present “substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling.” 21 U.S.C. § 355(d). Though here the plaintiffs’ complaint states that the FDA generally “requires at least two adequate and well-controlled studies,” J.A. 59,[3] federal law expressly authorizes the FDA to make the requisite finding of “substantial evidence” based solely on “data from one adequate and well-controlled clinical investigation and confirmatory evidence (obtained prior to or after such investigation),” 21 U.S.C. § 355(d). Likewise, as the complaint recognizes, the FDA Guidelines note that the agency “may acknowledge the persuasiveness of a single, internally consistent, strong multicenter study.” J.A. 60.
Chelsea based its FDA application on two sets of data. First and foremost, there was the data from Study 301, which successfully demonstrated the drug’s efficacy. In addition, Chelsea offered supplemental data from Study 302, which, though failing to meet its primary endpoint, showed what Chelsea later determined to be a “nominally statistically significant improvement” in the score used to measure the drug’s clinical efficacy. J.A. 42. These were the data that the advisory committee reviewed in February 2012, and the committee voted, seven to four, to recommend approving the drug. The chairperson, who was among those voting in favor of approval, explained that there was “no question in [his] mind that this drug is efficacious, particularly in a subset of patients?’ J.A. 203.[4] Other members echoed those remarks. One said he saw “substantial evidence of substantial benefit for some patients.” Id. at 205. Another said he “could not in a clear conscience vote no and deprive those patients from the benefits they can derive at this point from this medication.” Id. at 67.
Nonetheless, the plaintiffs assert that Chelsea knew the FDA expected two successful studies. This claim rests, in large part, on a discussion that took place at the advisory committee meeting. There, one FDA administrator, Dr. Steve Graham (“Graham”), recalled that the “very first thing we said” in the special protocol assessment for Study 301 was “that the study in and of itself wouldn’t be sufficient, that we wanted two studies.” J.A. 61. According to Graham, the FDA also “said that we wanted durability,” a statement the agency “repeated on at least two subsequent occasions on information letters to the company.” Id. However, at that very same meeting, Graham himself conceded that Study 301 alone, if successful, may be sufficient to support the application. If, he said, that single study presented “an overwhelming effect[,] ... you’d be a fool not to approve it.” Id. at 62.
In its December 20, 2010 press release, Chelsea announced that the FDA had “agreed” that the proposed application “could be submitted” based on Studies 301 and 302 “without the need for any further efficacy studies.” J.A. 233. The plaintiffs’ complaint does not dispute the literal truth of this announcement. Nor is there any *615 reason to doubt that Chelsea interpreted the FDA’s feedback as highly encouraging. The company’s actions are proof positive that it did. Rather than wait to complete Study 306, Chelsea pressed ahead and submitted its application exactly as it said it would, with only Study 301 and supplemental support from Study 302 to its credit. Against this backdrop, the most compelling inference is not that Chelsea acted with wrongful intent, but that it believed its prospects were good. See Kuyat v. BioMimetic Therapeutics, Inc., 747 F.3d 435, 441 (6th Cir.2014) (concluding that a medical-device manufacturer “could legitimately believe that the statistically significant results” of its study “would be sufficient to obtain approval by the FDA,” despite private communications in which the FDA indicated that it expected a more expansive study than the one provided).
2.
The plaintiffs’ claim that Chelsea’s public statements were intentionally fraudulent or severely reckless runs into another problem, which is that those statements were not unreservedly optimistic. On the contrary, the company consistently acknowledged the obstacles in its path.
In a December 2010 conference call, Chelsea’s CEO acknowledged that the FDA had expressed an interest in seeing “two additional studies.” J.A. 81. Later, in its September 30, 2011 quarterly report to the SEC — from which the plaintiffs’ complaint quotes — the company listed numerous reasons why the FDA “may not accept or approve” the Northera application. Id. at 141. When the FDA staff issued its briefing document opposing Chelsea’s application, the company issued a press release noting its receipt of the document and explaining that “several lines of inquiry ... have emerged as significant components of the benefit-risk analysis of Northera.” Id. at 248 (internal quotation marks omitted). These issues, according to the February 2012 press release, included “the short duration of our clinical studies, the limited size of our study population given the orphan indication and the challenges in quantifying symptomatic and clinical benefit.” Id. (internal quotation marks omitted). Similarly, when the FDA rejected Chelsea’s application in March 2012, the company explained in a press release that it had received the FDA’s complete response letter, and that this letter requested data from an “additional positive study to support efficacy.”[5] Id. at 68. The company continued to say that it planned to “request a meeting with the FDA to review the Agency’s comments, clinical trial recommendations and to help determine appropriate next steps toward securing approval of Northera.” Id. at 69.
The market responded to these statements accordingly. As the majority notes, Chelsea’s stock dropped 37.5 percent following the February 2012 press release discussing the FDA briefing document. Likewise, the stock fell 28 percent in response to the March 2012 press release discussing the FDA’s rejection of droxidopa. These reactions call into question whether Chelsea’s press releases were misleading at all — let alone whether the danger of misleading people was “so obvious” that making those statements must *616 have been severely reckless. Cozzarelli, 549 F.3d at 623 (internal quotation marks omitted).
II.
As we stated in Cozzarelli we do not infer scienter “from every bullish statement by a pharmaceutical company that was trying to raise funds.” 549 F.3d 618, 627 (4th Cir.2008). If we did, “we would choke off the lifeblood of innovation in medicine by fueling frivolous litigation.” Id. Today’s decision clears the way for more litigation, heightening the risk that shareholders will exploit the judicial process to extract settlements from corporations they chose to fund. This is exactly what Congress sought to prevent when it enacted the PSLRA. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 320, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Accordingly, I would affirm the judgment of the district court.

. I do not object to the majority's determination that the district court misused the challenged SEC documents. However, in my view, the court’s reliance on those documents is of no consequence. The plaintiffs' complaint ought to fail regardless.

. For its part, the Supreme Court has never stated whether recklessness is enough to satisfy the section 10(b) scienter requirement. See Matrixx Initiatives, Inc. v. Siracusano, - U.S. -, 131 S.Ct. 1309, 1323, 179 L.Ed.2d 398 (2011) (noting that the Court has "not decided whether recklessness suffices to fulfill the scienter requirement” and finding it unnecessary to settle the issue under the circumstances of the case).

. Citations to the "J.A.” refer to the Joint Appendix filed by the parties in this appeal.

. The complaint quotes selectively from the advisory committee meeting transcript. Accordingly, although this comment does not appear in the complaint, we may consider it here because it is incorporated into the complaint by reference. See Cozzarelli, 549 F.3d at 625.

. The company issued this press release on March 28, 2012. This date is significant both because it is the same day that Chelsea received the FDA's complete response letter and because it marks the final day of the class period. Despite the majority’s claim to the contrary, see ante at 610-11 n. 8, the company's statements on this date are indeed relevant to the scienter inquiry because they undermine the plaintiffs’ assertion that Chelsea intentionally or recklessly failed to disclose critical information during the class period.