NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0299n.06

Case No. 20-5710

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jun 28, 2021
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| CYNTHIA PITTMAN, Individually and on Behalf of All Others Similarly Situated, et al., | ) ) ) |
| Plaintiffs-Appellants, | ) ) ) |
| v. | ) ) ) |
| UNUM GROUP, et al., | ) ) |
| Defendants-Appellees. | ) ) ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

BEFORE: COLE, STRANCH, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. Unum Group is an insurance company that thought it could profit from the sale of "long-term-care" policies. These policies provide support for individuals as they age, often by paying for nursing-home and other care. But Unum's calculations turned out to be off, and the policies generated large losses. Unum announced that it had to divert some of its cash into the reserve account used to fund these policies. The stock price fell, and investors sued. They alleged that the company misled them in violation of the Securities Exchange Act of 1934. In a thorough opinion, the district court analyzed the plaintiffs' allegations and held that they were insufficient to state a claim for securities fraud. We agree and affirm.

I.

A.

Unum Group sells disability, life, accident, critical-illness, and other types of insurance. It previously sold long-term-care (LTC) policies. These policies are designed to cover costs associated with aging, such as assisted-living and nursing-home care.

LTC policies became increasingly popular in the 1970s. At the time, insurance companies (including Unum) thought the policies would turn a large profit. But as it turns out, the "major pricing assumptions" underlying LTC policies were "woefully inaccurate." R. 37, Pg. ID 302. Policy holders began living longer and requiring more care, fewer individuals let their policies lapse, and interest rates declined (reducing insurance companies' investment returns). As a result, most LTC policies were not profitable. And many companies stopped issuing them. But these companies still faced significant liabilities from their existing policies.

Unum's results were in line with industry trends. It stopped issuing new LTC policies by 2012. Yet it continues to manage a block of already-issued LTC policies. These policies cover nearly one million lives and generate over $600 million in income from premiums each year. To cover future liabilities associated with its LTC policies, Unum established a reserve fund. The challenge was in determining how much money to put into this fund. Unum relied on various factors to set its original reserve amount. These factors included annual premiums paid, interest earned on reserves, policy lapse rates, and benefits paid out.

In 2014, Unum concluded that its LTC reserves were inadequate. So it increased them by $698 million. It also updated its reserve assumptions, hoping to avoid future increases. When Unum did so, it informed investors that it was going to use a formula called an "interest-adjusted loss ratio" to monitor the reserves. Unum publicly released its loss ratio each quarter. It told

investors that if the ratio stayed in the 85–90% range, it would not have to increase reserves. If, however, the ratio exceeded 90% "for a prolonged period of time," Unum said it would have to reconsider its "reserve assumptions." R. 37, Pg. ID 336.

At first, Unum's loss ratio remained in range. But signs of trouble emerged in 2016: The loss ratio exceeded 90% for two quarters. It dropped back down into an acceptable range for the next three, but then things took a turn for the worse. In the final two quarters of 2017, Unum's loss ratio twice exceeded 90%. And when the same thing happened in the first quarter of 2018, the situation came to a head. Unum told investors that it would have to reevaluate its LTC reserves. Investors recognized that a large reserve charge was likely, and the company's shares fell nearly 17%. (Later that year, Unum increased its LTC reserves by $750 million.)

B.

In the aftermath of these stock losses, some investors filed proposed class-action lawsuits. The district court consolidated the cases and appointed lead counsel to represent a putative class of investors. The proposed class covered those who acquired Unum stock from October 27, 2016, to May 1, 2018.

Plaintiffs allege that Unum Group and four of its corporate officers engaged in securities fraud. *See* 15 U.S.C. § 78j(b) (direct liability); 15 U.S.C. § 78t(a) (controlling-person liability). How? By misleading investors about the health of Unum's LTC insurance business and reserves. More specifically, plaintiffs allege that Unum misled investors about: (1) its success in obtaining state approval for premium increases; (2) the types of policies in its LTC block; (3) its loss ratio, including the relevance of that ratio for evaluating its reserves; and (4) its conformity with certain accounting practices.

Plaintiffs argue that Unum's alleged misstatements and omissions violated section 10(b) of the Exchange Act, as implemented by SEC Rule 10b-5.[1] *See* 15 U.S.C. § 78j(b). SEC Rule 10b-5 says that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To establish a violation of this provision, a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). If a plaintiff fails to plausibly allege even one of these elements, a securities-fraud claim cannot proceed.

In response to the complaint, Unum filed a motion to dismiss. The district court granted the motion. It held that the plaintiffs failed to adequately allege at least two elements: (1) a material misstatement or omission, and (2) scienter, which is the required mental state for a finding of liability.

This appeal followed.

## II.

We review the district court's decision de novo, accept the plaintiffs' factual allegations as true, and construe the complaint in their favor. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014). Because the district court correctly held that the plaintiffs failed to adequately

---

[1] Plaintiffs also argue that the defendant corporate officers are qualifying "controlling person[s]" and thus liable for the company's fraudulent acts under section 20(a) of the Exchange Act. *See* 15 U.S.C. § 78t(a). To establish controlling-person liability under section 20(a), a plaintiff must first show a primary violation of securities law. *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1045 (6th Cir. 2016). Since plaintiffs' section 20(a) claims are contingent on their section 10(b) claim succeeding, and since their section 10(b) claim does not, we provide no independent analysis of plaintiffs' section 20(a) claims.

allege scienter, we affirm. We need not, and thus do not, address the district court's conclusion that plaintiffs also failed to adequately allege a material misstatement or omission.

A.

Before proceeding to our analysis, a bit of background on scienter is helpful. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). To plead scienter in a securities-fraud case, a plaintiff must "state with particularity facts giving rise to a strong inference," 15 U.S.C. § 78u–4(b)(2)(A), that the defendant acted with either (1) a "knowing and deliberate intent to manipulate, deceive, or defraud," or (2) recklessness. *Doshi*, 823 F.3d at 1039. An inference of scienter is strong only if the inference is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. It is not enough that the inference is "merely plausible or reasonable." *Id.*; *see also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 683 (6th Cir. 2005).

We evaluate scienter by looking at "all the allegations holistically." *Tellabs*, 551 U.S. at 326. In doing so, we consider a list of nine factors:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Doshi*, 823 F.3d at 1039–40 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc)).  This list of factors, "while not exhaustive," is "at least helpful in guiding securities fraud pleading." *Helwig*, 251 F.3d at 552.

In analyzing scienter, the district court noted that the plaintiffs had not presented any evidence as to the first, second, fourth, seventh, and eighth factors.  So it focused its analysis on the remaining factors.  And it found that those factors provided little or no support for scienter. Thus, it concluded that any inference of scienter was not "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

B.

The plaintiffs urge us to reach a different result.  They point to five pieces of evidence that they say support scienter.  But after reviewing the evidence holistically, we conclude that the district court was correct:  Any inference of scienter is not at least as compelling as an opposing inference of nonfraudulent intent.

1.  The plaintiffs first argue that Unum's close attention to its LTC business and the overall importance of Unum's LTC reserves support an inference of fraudulent intent.  The theory seems to be that because Unum's executives had extensive knowledge of the company's LTC business, it is more likely that the company acted fraudulently.  But the fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent.  So this is not a scienter-bolstering fact.

2. Next, the plaintiffs contend that Unum made public statements that were at odds with factual information known by the company. And when a company shows "disregard of the most current factual information before making statements," this supports an inference of scienter. *Helwig*, 251 F.3d at 552 (the sixth factor). The plaintiffs allege that Unum's statements were in conflict with the facts in two ways.

First, Unum's officers "continually told investors that they had a granular view of Unum's all-important LTC block and the underlying factors affecting its reserves." Appellant Br. 65. And these executives undoubtedly had access to "financial reporting . . . at all times through its software." *Id.* at 66. Thus, plaintiffs argue, Unum must have known its LTC block was "troubled" even though it "reassured" investors that it was not. *Id.* But "fraudulent intent cannot be inferred merely from the [executives'] positions in the [c]ompany and alleged access to information." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004). And since that is the gist of what plaintiffs allege here, this argument falls short.

Second, the plaintiffs contend that Unum mischaracterized its requests for rate increases as being on track. (Rate increases generally require approval from state regulatory bodies.) But such statements were not misleading because Unum revealed the approval percentages for investors to make their own judgments. For example, Unum told investors in October 2016 that it had achieved over two-thirds of its assumed rate increases. R. 37, Pg. ID 314 ("Less than a third of those rate increase assumptions remain outstanding."). And it told investors in May and December 2017 that it had achieved "85% to 90%" of its assumed increases. *Id.* at 318, 320. What's more, these statistics made clear that at least some of Unum's rate requests remained outstanding (the 10% to 15% gap). And plaintiffs do not allege that the disclosures were false. So any investor buying stock during this period would have been in a position to draw his or her own conclusions from

the evidence. Unum's characterization of "the statistical facts already disclosed" is not securities fraud. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016). At worst, the statements amount to corporate puffery or undue optimism, neither of which gives rise to liability. *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570–71 (6th Cir. 2004).

3. The plaintiffs also argue that a California lawsuit filed against Unum in May of 2013 bolsters the case for scienter. *See Don v. Unum Life Ins. Co. of Am.*, No. BC509235 (Cal. Super. Ct. May 17, 2013). That lawsuit alleged that Unum improperly calculated benefits for its LTC policyholders. Unum settled the suit in November 2015.

The "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit" could support an inference of scienter. *Helwig*, 251 F.3d at 552 (the fifth factor). But those criteria are not met here. As the district court recognized, the allegations of wrongdoing in the California suit relate to an entirely different course of conduct (miscalculating rate-of-inflation increases and improperly determining policy anniversaries). And that course of conduct ended before the class period in this suit even began. Since the evidence in the two suits is not "closely related," the settlement of the first suit is not persuasive evidence of scienter in the second. *See City of Monroe*, 399 F.3d at 685. What's more, despite plaintiffs' assertion that settlement talks began a few months after the first lawsuit was filed, the case did not actually settle until November 2015—roughly two and a half years after the suit was filed. That is not the kind of "quick settlement" that generates a meaningful inference of scienter. *Helwig*, 251 F.3d at 552.

4. Additionally, the plaintiffs argue that the closeness in time between allegedly false statements and the later disclosure of inconsistent information supports a finding of scienter. *Id.* (the third *Helwig* factor). They allege that the timing of Unum's announcement in early May 2018

that it was reassessing its LTC reserves supports scienter because of its temporal proximity to two events.

The more proximate of the two events was Unum's filing of a proxy statement on April 12, 2018. Plaintiffs allege that statements in the proxy improperly highlighted Unum's "purported success in managing Unum's Closed Block operations, and repeated Unum's inflated fiscal 2017 results." Appellant Br. 72 (emphasis omitted). We have previously held that the passage of just six weeks between an allegedly false statement and the disclosure of contrary information weighs "minimally" in favor of scienter. *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018). So the slightly shorter gap in this case (about three weeks) would also provide some support for scienter.

Plaintiffs fault the district court for largely overlooking this point. Unum, for its part, suggests the district court may have overlooked the point because the proxy statement "is not the subject of any one of [the] myriad misstatement claims" in the complaint. Appellee Br. 50 (emphasis omitted). Unum has a point: Plaintiffs only mention the April 2018 proxy statement twice in their complaint, and briefly at that. But even assuming the plaintiffs adequately raised the issue below, and even assuming the plaintiffs could show a true inconsistency between the May statements and the April proxy, the timing would provide only a moderate boost for scienter.

The second event, even less proximate, was Unum's filing of its Form 10-K on February 21, 2018. According to plaintiffs, the form contained "false and misleading statements about Unum's purported success in achieving rate increases, its reserves' adequacy, and the sustainability of its LTC ratio." Appellant Br. 71–72. But plaintiffs never identify the specific statements they contend were inaccurate in the filing, nor do they develop more specific arguments based on the filing. Thus, they have forfeited the issue. *See In re Darvocet, Darvon, &*

*Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 932 (6th Cir. 2014). And in any event, having been made ten weeks prior to the early May disclosure, these allegedly inaccurate statements offer at most "minimal[]" support for scienter, *see Dougherty*, 905 F.3d at 981, if any at all, *see City of Monroe*, 399 F.3d at 688 (statements made over sixteen weeks prior to a disclosure are too remote to support a scienter inference).

5. Finally, the plaintiffs argue that Unum's executives had a financial incentive to engage in fraud, and that this bolsters the case for scienter. More specifically, they allege that Unum's Chief Executive Officer and Chief Financial Officer were "motivated to engage in [fraud] because portions of their compensation during the Class Period were specifically tied to the performance, or perceived performance, of Unum's LTC business." R. 37, Pg. ID 398. Plaintiffs base this allegation on statements from Unum's compensation committee explaining that it awarded both executives bonus compensation (in part) for their role in "developing and executing the company's [LTC] strategy," maintaining the block's "stability," and ensuring that financial performance was "within expectations." *Id.* at 398–99. The district court held that the bonus compensation did not favor scienter because the bonus-based claims were too general and too speculative to support a specific inference of scienter.

Our starting point is *Helwig*. There we explained that "the self-interested motivation of defendants in the form of saving their salaries or jobs" tends to support a finding of scienter. *Helwig*, 251 F.3d at 552 (the ninth factor). In applying this principle to executive compensation, we have explained that merely alleging that an executive's "compensation is directly tied to the company's performance" is not enough to bolster an inference of scienter. *Dougherty*, 905 F.3d at 981. However, where a bonus is "directly tied" to fraudulent metrics promoted by an executive, that fact bolsters scienter. *Frank v. Dana Corp.*, 646 F.3d 954, 960, 962 (6th Cir. 2011). At best,

this case lies somewhere between *Dougherty* and *Frank*, and any link between the allegations and the bonuses would be quite modest. The bonuses were not tied to a single key metric, but rather (in part) to the executives' overall performance in managing the LTC block, which was their job. And given the paucity of other evidence supporting scienter, the bonus compensation would not be enough to push plaintiffs' case for scienter over the finish line.

## C.

After weighing this evidence, we conclude that any whiff of scienter is not "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. As Unum argues, the facts in this case are more consistent with a company playing "a constant game of catch-up than with fraud." Appellee Br. 55–56 (cleaned up) (quoting *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 399 (S.D.N.Y. 2019)). Unum raised its reserves multiple times over a short period. Other major insurance companies had to increase their reserves too. When Unum increased its reserves in 2014, it admitted that it was not immune to future reserve charges. And it told investors that "if the current environment persists longer than the three- to five-year time horizon, we will probably have to revisit the assumption again." R. 54-4, Pg. ID 548.

What's more, Unum also told investors that if its loss ratio exceeded 90% "for a prolonged period of time," it would have to reconsider its "reserve assumptions." R. 37, Pg. ID 336. It then disclosed its loss ratio each quarter, readily revealing when that ratio exceeded the 90% benchmark. And when Unum's loss ratio exceeded 90% for three straight quarters, the company did what it had promised to do: It revisited its reserve assumptions. This is "hardly the sort of behavior one would expect from the perpetrator of securities fraud." *SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992).

\* \* \*

For all of these reasons, we hold that the plaintiffs failed to adequately allege an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. We thus affirm the judgment of the district court dismissing plaintiffs' complaint for failure to state a claim.